**GULF OIL CORPORATION**

v.

**UNITED STATES of America.**

**No. 367 of 1953.**

United States District Court
E. D. Pennsylvania.

May 7, 1956.

Burlingham, Hupper & Kennedy, New York City, and Benjamin F. Stahl, Jr., for Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for libellant.

Harold G. Wilson, Buffalo, N. Y., and G. Clinton Fogwell, Jr., for W. Wilson White, U. S. Atty., Philadelphia, Pa., for respondent.

KRAFT, District Judge.

### Findings of Fact

1. Libellant, Gulf Oil Corporation, is a Pennsylvania corporation, and was at all times material herein the owner of the T-2 type tanker Gulfmeadows.

2. At all times material, respondent, United States of America, was the owner of the self-propelled, hopper-type dredge New Orleans, a public vessel of the United States of America operated by the Corps of Engineers, United States Army.

3. During the early morning hours of October 25, 1951, the Gulfmeadows (504 feet long between perpendiculars and 523 feet long overall, 68.2 feet wide and drawing 5 feet 3 inches forward and 20 feet 3 inches aft) was proceeding up the Delaware River at approximately 16 knots on a 2 knot flood tide.

4. The Gulfmeadows proceeded in the Liston Range (800 feet wide, 17 miles long and maintained by the Corps of Engineers, United States Army at a depth of 40 feet) in a northwesterly direction on the starboard (New Jersey or eastern) side of the channel.

5. During the course of this northwesterly run, the Gulfmeadows took various navigational markers abeam in the following sequence:

(a) Light, "Ship John Shoal," starboard hand.

(b) Buoy No. 42, flashing white, starboard hand, 23,400 feet northwest of "Ship John Shoal" light.

(c) Buoy N–4L, unlighted, starboard hand, 13,600 feet northwest of buoy No. 42.

(d) Buoy C–5L, port hand, 4,500 feet northwest of buoy N–4L, normally unlighted, but on this date hung with two lighted lanterns.

(e) Buoy 6L, flashing white, starboard hand, 4,500 feet northwest of buoy C–5L.

(f) "Dredging Buoy", two lighted lanterns, port hand, approximately 4,000 feet northwest of buoy 6L and 100 feet west of the westerly side of the channel.

6. At and during this time on the same date, the New Orleans was engaged in dredging operations on the westerly (Delaware) side of the channel.

7. The weather during the time in question was clear with good visibility; the wind was not a factor in the events which followed.

8. The New Orleans was engaged in a dredging operation, under official orders, on the westerly side of the channel in an area approximately 10,000 feet long, extending from a point approximately 4,000 feet upriver from a point opposite buoy 6L (located at the easterly side of the channel) to a point approximately 6,000 feet downriver from a point opposite this buoy. This area is bounded by reference points 299†000 and 309†000 on the Delaware River Channel Examination prepared September 26, 1951 by the Corps of Engineers, United States Army.

9. The New Orleans was dredging at a speed of about 3 knots against the flood tide, working downriver in the upper half of the area to be dredged. Its normal operation was to work the lower half upriver on ebb tide.

10. The normal operation of the New Orleans was to make a dredging run of about 5,000 feet, at which stage her hoppers were full. She would then proceed to the dumping area. This area was approximately 6,000 feet long extending between reference points 297†000 and 303†-000 and located approximately 2400 feet east of the easterly side of the channel. The New Orleans would discharge her hoppers there.

11. At 0257 on October 25, 1951, the New Orleans, heading downriver, commenced a dredging run from approximately reference point 299†000 and ceased dredging and engine propulsion at 0312 in the vicinity of reference point 304†500.

12. An order for a hard right rudder on the Gulfmeadows was given as an evasive action to avoid what appeared to the con to be an impending collision with the New Orleans.

13. The hard right rudder maneuver was ordered when the con saw the running lights of the New Orleans change from red to red-green to green, indicating a turn to port.

14. The Gulfmeadows took the evasive measure because the New Orleans, at the end of a dredging cut along the extreme western side of the channel, made a 90° turn to her port to prepare to proceed to the dumping grounds. This turn was accomplished wholly within the western half of the channel by simultaneously running the starboard engines forward and the port engines in reverse.

15. During this evasive action the Gulfmeadows struck or was struck by an unseen floating or slightly submerged object. The initial impact was felt approximately amidship on the starboard side. Subsequent impacts occurred along the side of the hull as the Gulfmeadows transferred during a hard right rudder maneuver. The impact involved the propeller.

16. The Gulfmeadows' collision with the unseen object occurred out of and east of the easterly side of the channel.

17. At all times during the period material herein, the Gulfmeadows maintained a constant speed of 16 knots.

18. Both the Gulfmeadows and the New Orleans were running with regulation lights.

19. In the 35 to 40 minutes during which the pilot of the Gulfmeadows testified he had the New Orleans under constant observation, the New Orleans made one round trip across to the eastern side of the channel to the dumping grounds and back again. The pilot made no mention of having observed this action of the New Orleans which would have been in his full view if he had had the vessel under constant observation from "Ship John Shoal" Light, as he testified.

20. After the collision with the unseen object, the Gulfmeadows proceeded uneventfully to the completion of her voyage with no effects from the impacts then apparent. At all times the ship handled normally.

21. Despite the fact that there were no then apparent indicia of damage, the ship was ballasted down in the bow and pumped out in the stern the next day in the Port of Philadelphia. Inspection of the propeller, by hand turning, revealed two small nicks on one of the blades.

22. The Gulfmeadows thereafter proceeded, via Hell Gate, to New Haven during which voyage no vibration or other indicia of damage were observed. The vessel then proceeded to Boston during which voyage sundry tests were made which disclosed no damage.

23. The Gulfmeadows did not strike buoy 6L and the identity of the unseen object which it struck is not established by a fair preponderance of the evidence.

24. The order for hard right rudder on the Gulfmeadows and the subsequent course taken by the vessel in consequence of that order resulted from judgment based upon insufficient and inaccurate observation of the New Orleans by those responsible for the navigation of the Gulfmeadows.

25. The extensive damage to the propeller and propeller shaft of the Gulf-

meadows (which was repaired between May 19 and June 7, 1952) was not established by a fair preponderance of the evidence to have been caused by the striking of the unseen object by the Gulfmeadows on October 25, 1951.

### Conclusions of Law

1. The court has jurisdiction of the parties.

2. The court has jurisdiction of the subject-matter.

3. The striking of the unseen object by the Gulfmeadows on October 25, 1951 was not caused by any fault or negligence of the dredge New Orleans or those in charge of her at that time and place.

### Discussion

The case presents a novel situation. The original libel alleged that the Gulfmeadows collided with unlighted buoy 4L and respondent's answer admitted that allegation. At the trial, libellant attempted to prove this fact while respondent attempted to establish the utter impossibility of such an occurrence. In its post-trial brief, however, libellant adopted respondent's trial position that the Gulfmeadows could not have struck unlighted buoy 4L and asserted, as the only possible conclusion, that the Gulfmeadows *could* have struck buoy 6L (designated as a lighted buoy). Libellant thereafter moved for leave to amend the pleadings to conform to what it then contended was its proof.

After ascertaining that respondent had no objection, and pointing out to libellant the anomalous situation the proposed amendment would create, leave to amend was granted. Thus the court is now confronted with a situation wherein the libel now alleges that the Gulfmeadows collided with buoy 6L (a lighted buoy) and libellant's evidence attempts to establish a collision with unlighted buoy 4L, which is 9,000 feet from buoy 6L. Respondent has expressed no desire to change its position in face of this amendment.

In view of the conflict within libellant's own case and the substantial abandonment of its own proofs, coupled with its failure to prove what it now pleads, the conclusion is inescapable that the libellant does not know what the Gulfmeadows struck, whether one buoy or another or some unseen or slightly submerged object.

Judgment for respondent.